**UNDER SEAL**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JUL 18 2017

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mj-00335 |
| | ) | |
| THOMAS JOHN ENNIS, | ) | **UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Shane D. Dana, being duly sworn, state as follows:

**I.  INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation (the "FBI") and have been so employed since November 2003. I am currently assigned to CR-14 of the Washington Field Office's Criminal Investigative Division where my focus is on investigating violations of federal narcotics laws. I am a law enforcement officer of the United States within the meaning of Title 5, United States Code, Section 8401(17)(A)(i)(I).

2. I have conducted and participated in numerous investigations resulting in the arrest and conviction of drug distributors and the seizure of controlled substances. Many of these investigations have involved the distribution of Schedule I narcotics, including heroin. I have received training in drug identification, narcotics investigations, search and seizure, covert communications, and surveillance operations.

3. Based on my training and experience, I am familiar with the use, effects, and methods of distribution of controlled substances.

4. This affidavit is submitted in support of the following:

    a.    a criminal complaint charging THOMAS JOHN ENNIS with knowingly distributing heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); and

    b.    an arrest warrant for THOMAS JOHN ENNIS.

5. I am familiar with all aspects of this investigation because I have personally participated in it as the lead case agent and because I have either spoken with or analyzed reports submitted by other law enforcement officers who are also involved in this investigation.

6. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation as well as the observations of other law enforcement officers involved in this investigation. All observations that were not personally made by me were related to me by the persons who made such observations.

7. This affidavit is being prepared only for the purpose of obtaining a criminal complaint and arrest warrant. Therefore, it contains neither all of the information known to me concerning the offense nor every material fact learned during the course of this investigation.

## II. BACKGROUND CONCERNING HEROIN

8. Based on information obtained through my training and through previous investigations, I have learned that heroin is a highly addictive opioid processed from morphine, a naturally occurring substance extracted from certain varieties of poppy plants. Heroin is typically sold as a white or brownish powder, or as a black sticky substance, also known as "black tar" heroin. Heroin can be injected, smoked, or sniffed/snorted, and it is particularly addictive, both physically and psychologically. Heroin is a Schedule I controlled substance, meaning that it has no currently accepted medical use and is among the most dangerous drugs with the potential for severe psychological or physical dependence. Heroin is often combined by

dealers with other harmful substances, including fentanyl, carfentanyl, and other powerful synthetic opioids, which has led to a dramatic rise in overdose deaths in the past two years.

## III. FACTUAL BASIS PROVIDING PROBABLE CAUSE

### A. Tracking Device and Surveillance

9. On December 6, 2016, pursuant to a federal warrant issued by United States Magistrate Judge Theresa Carroll Buchanan, FBI agents installed a GPS tracking device on a 2012 blue Jeep Grand Cherokee bearing Virginia license plate number "VHD2718" (hereinafter, the "blue Jeep") that FBI mobile surveillance teams had previously observed ENNIS driving on multiple occasions during October and November 2016. Authorization to use the tracking device was extended for 45 days on January 13, 2017, and for another 45 days on February 24, 2017.

10. Data collected by the tracking device revealed that, on the morning of December 7, 2016, the day after the tracking device's installation, the blue Jeep traveled to the residence of a confidential informant (hereinafter, "CI-1") in Manassas, Virginia, before proceeding to the vicinity of 56th Place, N.E., in Washington, D.C. The blue Jeep stayed there for a few minutes and then traveled back to CI-1's residence. This pattern of travel continued for the next two weeks. From December 7 to December 20, 2016, the blue Jeep made approximately 13 trips to Washington, D.C., typically at or near 56th Place, N.E. The trips lasted between three and 23 minutes. On eight of those occasions, the blue Jeep traveled to the vicinity of CI-1's residence, both before and after making the trip to Washington, D.C. Additionally, many of the trips to Washington, D.C. were preceded by a stop in the vicinity of an ATM machine.

11. On December 12, 2016, an FBI surveillance team documented one of these trips, confirming the data being provided by the tracking device. Team members observed ENNIS drive the blue Jeep from his residence in Fairfax, Virginia, to CI-1's residence in Manassas,

3

Virginia. Team members further documented ENNIS and CI-1 travel to a Navy Federal Credit Union in Dillingham Square in Manassas, Virginia, and then to an Exxon gas station on Gordon Boulevard in Woodbridge, Virginia, before traveling to 56th Place, N.E., in Washington, D.C. There, surveillance units saw ENNIS and CI-1 meet up with a light-skinned black male in a gold sedan bearing a baseball-themed, Washington, D.C. vanity license plate ending in the number "500." After the meeting, which lasted three minutes, ENNIS and CI-1 traveled back to CI-1's residence.

12. Between December 7, 2016, and January 23, 2017, the blue Jeep traveled to 56th Place, N.E., or to other locations in close proximity thereto, approximately 38 times. These locations are significant to me, as they are near Marvin Gaye Park, a known heroin hub for Washington, D.C. sometimes called "Needle Park."

13. On or about December 21, 2016, ENNIS appeared to change his routine. While the blue Jeep continued to make almost daily trips to the same part of Washington, D.C., the meeting times there were earlier and trips to CI-1's residence were less common. Also, the blue Jeep started being parked for extended periods of time at or near the Sunoco gas station located at 44111 Ashburn Shopping Plaza in Ashburn, Virginia, leading me to believe that ENNIS had started working there.

14. On January 4, 2017, a surveillance team documented ENNIS' activities after data from the tracking device showed him returning from Washington, D.C. earlier that morning. While ENNIS was working at the gas station, surveillance team members observed him talking on his cell phone and then leaving the business to sit in the blue Jeep for a brief period of time. Approximately 10 to 15 minutes after ENNIS exited his vehicle and returned to the gas station, a confidential informant (hereinafter, "CI-2") arrived in a dark-colored Honda, parked, exited her

vehicle, and proceeded to open the driver's side door of the blue Jeep. After leaning into the blue Jeep, CI-2 shut the door, returned to the Honda with her left hand closed, and then drove away. Based on my training and experience, some drug dealers utilize their vehicles as "dead-drop" locations—*i.e.*, a disclosed location within a vehicle from which a customer takes the contraband and replaces it with cash.

15. It was later determined that CI-2 worked at a hair salon in Manassas, Virginia, and tracking device data from the blue Jeep shows brief visits to the parking lot of that location on seven occasions between December 7, 2016 and January 23, 2017, with stops lasting between one and nine minutes.

16. After December 21, 2016, and before February 3, 2017, ENNIS and CI-1 continued to meet. In addition to the eight days mentioned above in paragraph 10, the blue Jeep traveled to CI-1's residence on six other occasions. For example, on January 15, 2017, the blue Jeep traveled from ENNIS' residence to the vicinity of CI-2's workplace, where it remained for approximately two minutes. After a stop at a nearby Exxon gas station for about three minutes, the blue Jeep traveled to 56th Place, N.E., in Washington, D.C., where it remained for approximately seven minutes before traveling directly to the MGM Casino located at 101 MGM National Avenue in Oxon Hill, Maryland. The blue Jeep remained at the casino for about two hours before traveling to CI-1's residence, where it stayed for approximately 28 minutes.

17. Between December 20, 2016, and January 23, 2017, the blue Jeep traveled to the MGM Casino on six dates. Of those trips, five of them occurred immediately following a brief trip to the vicinity of 56th Place, N.E., or Ames Street, N.E, which is near the former.

18. On January 24, 2017, the blue Jeep again traveled to the MGM Casino. I conducted surveillance at the MGM Casino and later reviewed the casino security footage, which

5

revealed a meeting between ENNIS and CI-1 who was playing poker at the time. After CI-1 finished playing, he and ENNIS departed. After stopping at various locations in Fairfax County, Virginia, the blue Jeep traveled to a location on Ames Street, N.E. The blue Jeep stayed there for three minutes before leaving.

### B.     Controlled Purchases

19.     On February 1, 2017, an FBI surveillance team observed CI-2 drive to a bank and then to ENNIS' workplace, the Sunoco gas station in Ashburn, Virginia. After she met with ENNIS at the gas station, I confronted CI-2 and asked her to cooperate with the FBI's investigation. CI-2 agreed to assist and explained that ENNIS sells heroin to her on a daily basis. She further explained that she had already made arrangements with ENNIS that day to obtain 0.5 grams of heroin, which she was to pick up later that evening. CI-2 had given ENNIS $160 when they met earlier to cover the cost of the heroin.

20.     After agreeing to cooperate and signing a form documenting her consent to make recorded conversations, CI-2 communicated with ENNIS via text message to get details about picking up the heroin for which she had already paid. During these communications, ENNIS directed CI-2 to pick up the heroin from within his vehicle, which was parked at the Holiday Inn Chantilly – Dulles Expo, in Chantilly, Virginia, where he was then staying, in the same manner surveillance team members observed on January 4, 2017 (as described above in paragraph 14).

21.     FBI special agents surveilled CI-2 as she removed a zip-lock bag with a light-brown powdery substance from the center console of the blue Jeep as directed by ENNIS. CI-2 left in the bag's place $300 for heroin to be purchased the following day. CI-2 returned to a meeting location while under observation of FBI special agents and turned over the substance.

22. On February 2, 2017, I again met with CI-2. She explained that she had spoken with ENNIS who had informed her that he had a small quantity of heroin for her to pick up that day. CI-2 conducted a consensually recorded telephone call to ENNIS wherein she expressed her disappointment over coming to get a quantity smaller than what she was accustomed to receiving. CI-2 asked ENNIS to obtain the additional amount of heroin she was owed for the $300 that she provided. Thereafter, FBI video surveillance recorded CI-2 accessing the blue Jeep at ENNIS' place of employment in Ashburn, Virginia to retrieve the heroin she was purchasing from ENNIS. CI-2 retrieved a zip-lock bag containing a light-brown powdery substance from the blue Jeep's center console, which she turned over to FBI special agents. On July 17, 2017, I field tested the substance using an opioid alkaloid regent test kit. The results from the field test were positive.

C. **Search Warrants**

23. On February 3, 2017, FBI special agents executed a federal search warrant for the blue Jeep. At the time of the search, the vehicle was located at the Sunoco gas station in Ashburn, Virginia where ENNIS was working. FBI special agents located a small zip-lock bag containing a light-brown powdery substance in the center console of the vehicle. I believe that ENNIS intend for CI-2 to pick up this bag based on the timing of its discovery and communications between ENNIS and CI-2.

24. On February 3, 2017, FBI special agents executed a federal search warrant for ENNIS' person. The search revealed two small zip-lock bags containing a light-brown powdery substance within ENNIS' wallet.

25. On February 3, 2017, FBI special agents executed a federal search warrant for Room 426 at the Holiday Inn Chantilly – Dulles Expo. ENNIS and his girlfriend had rented the

room and were living there after having been evicted from their apartment in Fairfax, Virginia. Search team members located numerous small zip-lock bags that appeared identical in size, shape, and appearance to the zip-lock bags containing the light-brown powdery substance that ENNIS sold to CI-2 in the days immediately preceding the search. Some of the bags contained a powdery residue and were found near cut straws, which, based on my training and experience, I know are used to consume heroin.

**D.     Interviews**

    1.     <u>CI-2</u>

26.     When I spoke with CI-2 on February 1, 2017, she said she had been purchasing 0.5 grams of heroin from ENNIS on a daily basis for two years. During a subsequent interview at the United States Attorney's Office on April 18, 2017, CI-2 clarified that she went through a progression of heroin abuse during those two years and that her purchasing level had not been consistent throughout that period. She described her rate of heroin purchasing between the winter of 2014 and July 2015 as "occasional" due to her pregnancy during that same period. After giving birth in July 2015, CI-2 began purchasing heroin from ENNIS once per week. This escalated to daily purchases beginning in or around December 2016 and continuing until I confronted her on February 1, 2017. According to CI-2, her purchases of heroin from ENNIS occurred in various locations throughout the Eastern District of Virginia.

    2.     <u>CI-1</u>

27.     On February 3, 2017, and during an interview at the United States Attorney's Office on April 21, 2017, I spoke with CI-1 who described ENNIS' drug distribution activity. CI-1 said that ENNIS sold him heroin obtained from sources in Washington, D.C. According to CI-1, ENNIS would deliver the heroin at CI-1's residence in Manassas, Virginia. CI-1 admitted

to purchasing seven to 10 bags of heroin each day from ENNIS beginning in or around December 2015 and continuing through early February 2017 when the aforementioned federal search warrants were executed. Each of these bags were supposed to contain 0.5 grams of heroin; however, when CI-1 weighed them, the bags often contained only 0.4 grams. CI-1 suspected ENNIS was removing some of the heroin for himself.

28. CI-1 said that he traveled with ENNIS to Washington, D.C., to purchase heroin on approximately 10 occasions. During each of these trips, and when ENNIS delivered the heroin directly to CI-1's home, ENNIS was driving the blue Jeep. CI-1 further stated that ENNIS typically obtained heroin from a light-skinned black male who goes by the alias "W.B.,"[1] and who drove, among other vehicles, a gold sedan bearing a baseball-themed, Washington, D.C. vanity license plate ending in the number "500."

29. CI-1 also confirmed that ENNIS sold heroin to CI-2. According to CI-1, CI-2 made purchases from ENNIS very frequently after she gave birth to her child.

3. Thomas Ennis

30. On February 3, 2017, I, along with other FBI special agents, met with ENNIS at his workplace in Ashburn, Virginia. Before he was asked any questions, ENNIS signed a form acknowledging that he understood his rights, and he affirmatively agreed to speak with us. During our conversation, ENNIS admitted traveling to Washington, D.C. every day to purchase heroin from a light-skinned black male known to him by the alias "W.B.," who I have reason to believe is the same individual observed by FBI surveillance units meeting with ENNIS and CI-1 on December 12, 2016, as described above in paragraph 11, and the same individual identified

---

[1] Only the initials of the individual's alias are being provided here in order to protect the integrity of ongoing narcotics distribution investigations.

by CI-1 as ENNIS' primary supplier, as described above in paragraph 28. ENNIS said that, during these runs, he typically obtains approximately 0.5 grams of heroin for himself and 0.1 to 0.2 grams for his girlfriend. ENNIS further admitted that he provides about 0.5 grams of heroin every day to CI-2. At the conclusion of the meeting, I provided ENNIS with a target letter.

31. Data from the tracking device shows that, later the same day, the blue Jeep traveled to the vicinity of 56th Place, N.E. The data also shows that the blue Jeep continued to make these trips after that date and up until the tracking device was deactivated on or about April 10, 2017.

32. On May 9, 2017, I again approached ENNIS at his workplace and asked to speak with him. Before our discussion, ENNIS signed a form acknowledging that he understood his rights, and he affirmatively agreed to speak with me. At that point, I served notice on ENNIS that the blue Jeep had been equipped with a tracking device. ENNIS said that he continued to make the trips to Washington, D.C. after receiving the target letter to create the appearance that he was buying heroin. ENNIS maintained that he was only "driving around" at these locations for the benefit of the government, should his cooperation ever be sought.

## IV. CONCLUSION

33. Based on the facts set forth in this affidavit, there is probable cause to believe that on or about February 2, 2017, within the Eastern District of Virginia, THOMAS JOHN ENNIS did unlawfully, knowingly, and intentionally distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, 841(a)(1).

Shane D. Dana
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this 18th day of July 2017

/s/
John F. Anderson
United States Magistrate Judge

The Honorable John F. Anderson
United States Magistrate Judge